# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

NEW ENGLAND TEAMSTERS PENSION FUND, Individually and on behalf of all others similarly situated,

               Plaintiff,

     v.

RTX CORPORATION f/k/a RAYTHEON TECHNOLOGIES CORPORATION, GREGORY HAYES, NEIL MITCHILL, and ANTHONY F. O'BRIEN,

              Defendants.

**Case No.:**

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

<u>JURY TRIAL DEMANDED</u>

September 28, 2023

Plaintiff New England Teamsters Pension Fund ("New England Teamsters" or "Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through its attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding RTX Corporation f/k/a Raytheon Technologies Corporation ("RTX", "Raytheon", or the "Company"), and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded RTX securities between February 8, 2021 and September 8, 2023, inclusive (the "Class Period").  Plaintiff seeks to recover compensable damages caused by Defendant's violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") (17 C.F.R. § 240.10b-5).

3.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.    In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.    Plaintiff New England Teamsters, as set forth in the accompanying certification, incorporated by reference herein, purchased RTX securities during the Class Period and was economically damaged thereby.

7.      Defendant RTX purports to be "an aerospace and defense company that provides advanced systems and services for commercial, military and government customers worldwide."

8.      RTX has four principal business segments including, pertinent to this action, Pratt & Whitney ("Pratt & Whitney" or "Pratt").  The Company describes Pratt & Whitney as "among the world's leading suppliers of aircraft engines for commercial, military, business jet and general aviation customers."

9.      RTX is incorporated in Delaware and its head office is located at 1000 Wilson Boulevard, Arlington, Virginia 22209.  RTX's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "RTX."  Pratt & Whitney's corporate headquarters are located at 400 Main Street, East Hartford, Connecticut 06118.

10.     Defendant Gregory Hayes ("Hayes") has served as the Company's Chief Executive Officer ("CEO") since April 2020.  Hayes is also the Chairman of RTX's Board of Directors (the "Board").

11.     Defendant Neil Mitchill has served as the Company's Chief Financial Officer ("CFO") since April 2021.

12.     Defendant Anthony F. O'Brien was the Company's CFO from 2015 through April 9, 2021.

13.     Defendants Hayes, Mitchill, and O'Brien are collectively referred to herein as the "Individual Defendants."

14.     Each of the Individual Defendants:

        (a)     directly participated in the management of the Company;

        (b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)    was privy to confidential proprietary information concerning the Company and its business and operations;

(d)    was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)    was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)    was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)    approved or ratified these statements in violation of the federal securities laws.

15.    RTX is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

16.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

17.    RTX and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements
### Issued During the Class Period

18.    On February 8, 2021, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2020 (the "2020 Annual Report").  Attached to the 2020 Annual Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by defendants Hayes and O'Brien attesting to the accuracy of financial reporting, the disclosure of

any material changes to the Company's internal control over financial reporting and the disclosure

of all fraud.

19.     The 2020 Annual Report contained the following statements about Pratt and its

Geared Turbofan ("GTF") engines:

> Pratt & Whitney sells products and services principally to aircraft manufacturers, airlines and other aircraft operators, aircraft leasing companies and the U.S. and foreign governments. Pratt & Whitney's largest customer by sales is Airbus, with sales, prior to discounts and incentives, of 30%, 31% and 36% of total Pratt & Whitney segment sales in 2020, 2019 and 2018, respectively.
>
> Pratt & Whitney produces the PW1000G Geared Turbofan engine family, the first of which, the PW1100G-JM, entered into service in January 2016. ***The PW1000G Geared Turbofan engine has demonstrated a significant reduction in fuel burn and noise levels and lower environmental emissions when compared to legacy engines. The PW1100G-JM engine is offered on the Airbus A320neo family of aircraft.*** PW1000G Geared Turbofan engine models also power the Airbus A220 passenger aircraft and Embraer's E-Jet E2 family of aircraft and have been selected to power the new Irkut MC-21 passenger aircraft. Mitsubishi and Pratt & Whitney have signed a contract in recognition of the formal pause in MRJ70 and MRJ90 engine development for the SpaceJet program. In addition, P&WC's PW800 engine has been selected to exclusively power Gulfstream's new G500 and G600 business jets, as well as to power Dassault's new Falcon 6X business jet, which is scheduled to enter into service in 2022.
>
> *            *            *
>
> ***In 2020, Pratt & Whitney reached significant milestones on the Geared Turbofan (GTF) engine program, including achieving an industry-leading engine dispatch reliability rate of 99.98% for the GTF engines for the Airbus A320neo.*** The GTF engine family now powers more than 900 aircraft across 50 airlines and three aircraft platforms: Airbus A320neo family, Airbus A220 and Embraer E-Jets E2 family. Pratt & Whitney also delivered the 50,000th PT6 turboprop engine in the General Aviation segment. . . .
>
> (Emphasis added).

20.     These statements were materially false and misleading because there were

undisclosed quality control issues that had affected the GTF engines, and which would later require

their recall from service for reinspection, affecting various customers.

5

21.    The 2020 Annual Report contained the following risk disclosure regarding GTF engine production:

***We Design, Manufacture and Service Products that Incorporate Advanced Technologies; The Introduction of New Products and Technologies Involves Risks and We May Not Realize the Degree or Timing of Benefits Initially Anticipated; Competition May Reduce Our Revenues and Segment Share and Limit Our Future Opportunities.***

We seek to achieve growth through the design, development, production, sale and support of innovative commercial aerospace and defense systems and products that incorporate advanced technologies. The product, program and service needs of our customers change and evolve regularly, and we invest substantial amounts in research and development efforts to pursue advancements in a wide range of technologies, products and services.

***Of particular note, Pratt & Whitney is currently producing and delivering the PW1000G Geared Turbofan engine to power various aircraft, including the A320neo family of aircraft.*** The level of orders received for the Geared Turbofan family of engines, coupled with a requirement to achieve mature production levels in a very short time frame, require significant additional manufacturing and supply chain capacity. If any of our production ramp-up efforts are delayed, if suppliers cannot timely deliver or perform to our standards, and/or if we identify or experience issues with in-service engines, we may not meet customers' delivery schedules, which could result in material additional costs, including liquidated damages or other liabilities that could be assessed under existing contracts.

(Emphasis added)

Our ability to realize the anticipated benefits of our technological advancements depends on a variety of factors, including meeting development, production, certification and regulatory approval schedules; receiving regulatory approvals; execution of internal and external performance plans; availability of supplier and internally produced parts and materials; performance of suppliers and subcontractors; availability of supplier and internal facility capacity to perform maintenance, repair and overhaul services on our products; hiring and training of qualified personnel; achieving cost and production efficiencies; identification of emerging technological trends for our target end-customers; validation of innovative technologies; risks associated with the development of complex software; the level of customer interest in new technologies and products; and customer acceptance of products we manufacture or that incorporate technologies we develop. For example, our customers manufacture end products and larger aerospace systems that incorporate certain of our aerospace products. These systems and end products may also incorporate additional technologies manufactured by third parties and involve additional risks and uncertainties. As a result, the performance and industry acceptance of these larger systems and end

products could affect the level of customer interest in and acceptance of our products in the marketplace.

22.     This disclosure was materially false and misleading because there were quality control issues that had affected the GTF engines, and which would later require their recall from service for reinspection, affecting various customers.

23.     On February 11, 2022, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2021 (the "2021 Annual Report").  Attached to the 2021 Annual Report were certifications pursuant to SOX signed by defendants Hayes and Mitchill attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

24.     The 2021 Annual Report contained the following statements regarding Pratt:

Pratt & Whitney sells products and services principally to aircraft manufacturers, airlines and other aircraft operators, aircraft leasing companies and the U.S. and foreign governments. Pratt & Whitney's largest commercial customer by sales is Airbus, with sales, prior to discounts and incentives, of 31%, 30% and 31% of total Pratt & Whitney segment sales in 2021, 2020 and 2019, respectively.

***Pratt & Whitney produces the PW1000G Geared Turbofan (GTF) engine family, the first of which, the PW1100G-JM, entered into service in January 2016. The PW1000G GTF engine has demonstrated a significant reduction in fuel burn and noise levels and lower environmental emissions when compared to legacy engines.*** The PW1100G-JM engine is offered on the Airbus A320neo family of aircraft. PW1000G GTF engine models also power the Airbus A220 passenger aircraft and Embraer's E-Jet E2 family of aircraft and have been certified by the Russian civil aviation authority to power the Irkut MC-21 passenger aircraft. In addition, P&WC's PW800 engine has been selected to exclusively power Gulfstream's G400, G500 and G600 business jets, as well as to power Dassault's Falcon 6X business jet, which is scheduled to enter into service in 2022.

*                *                *

***The development of new engines and improvements to current production engines present important growth opportunities for Pratt & Whitney. In view of the risks and costs associated with developing new engines, Pratt & Whitney has entered into collaboration arrangements in which revenues, costs and risks are shared with third parties.*** At December 31, 2021, the interests of third-party collaboration participants in Pratt & Whitney-directed jet engine programs ranged,

in the aggregate per program, from 13% to 49%. See "Note 1: Basis of Presentation and Summary of Accounting Principles" within Item 8 of this Form 10-K for a description of our accounting for collaboration arrangements. Pratt & Whitney also continues to enhance its programs through performance improvement measures and product base expansion, utilizing similar collaboration arrangements.

*In 2021, Pratt & Whitney reached significant milestones on the GTF engine program, including the first flight of the GTF Advantage engine for the A320neo family. The GTF Advantage configuration further extends the economic and environmental benefits of the existing GTF engine, as it reduces fuel consumption by an additional 1 percent, extending the engine's lead as the most efficient powerplant for the A320neo family*. The GTF family now powers more than 1,100 aircraft across 58 airlines and three aircraft platforms: Airbus A320neo family, Airbus A220 and Embraer E-Jets E2. Also in 2021, Pratt & Whitney's V2500 program achieved 250 million flight hours. Pratt & Whitney was announced as the engine provider on the Dassault Falcon 6X and Gulfstream G400, representing two new platforms for its PW800 engine.. . .

(Emphasis added).

25.     These statements were materially false and misleading because there were quality control issues that had affected the GTF engines and which would later require their recall from service, affecting various customers.

26.     The 2021 Annual Report contained the following risk disclosure regarding GTF engine production:

*We Design, Manufacture and Service Products that Incorporate Advanced Technologies; The Introduction of New Products and Technologies Involves Risks and We May Not Realize the Degree or Timing of Benefits Initially Anticipated; Competition May Reduce Our Revenues and Segment Share and Limit Our Future Opportunities.* We seek to achieve growth through the design, development, production, sale and support of innovative commercial aerospace and defense systems and products that incorporate advanced technologies. The product, program and service needs of our customers change and evolve regularly, and we invest substantial amounts in research and development efforts to pursue advancements in a wide range of technologies, products and services. Of particular note, Pratt & Whitney is currently producing and delivering the Geared Turbofan engine to power various aircraft. The level of orders received for the Geared Turbofan family of engines, coupled with a requirement to achieve mature production levels in a very short time frame, require significant additional manufacturing and supply chain capacity. If any of our production ramp-up efforts are delayed, if suppliers cannot timely deliver or perform to our standards, and/or if we identify or experience issues with in-service engines, we may not meet

customers' delivery schedules, which could result in material additional costs, including liquidated damages or other liabilities that could be assessed under existing contracts.

27.     This disclosure was materially false and misleading because there were quality control issues that had affected the GTF engines and which would later require their recall from service, affecting various customers.

28.     On February 7, 2023, the Company filed with the SEC its Annual Report on Form 10-K for the year ended December 31, 2022 (the "2022 Annual Report"). Attached to the 2022 Annual Report were certifications pursuant to SOX signed by defendants Hayes and Mitchill attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

29.     The 2022 Annual Report contained the following statements about Pratt & Whitney, and, in pertinent part, its engines:

> Pratt & Whitney sells products and services principally to aircraft manufacturers, airlines and other aircraft operators, aircraft leasing companies and the U.S. and foreign governments. Pratt & Whitney's largest commercial customer by sales is Airbus, with sales, prior to discounts and incentives, of 33%, 31% and 30% of total Pratt & Whitney segment sales in 2022, 2021 and 2020, respectively.

> Pratt & Whitney produces the PW1000G Geared Turbofan (GTF) engine family, the first of which, the PW1100G-JM, entered into service in January 2016. The PW1000G GTF engine has demonstrated a significant reduction in fuel burn and noise levels and lower environmental emissions when compared to legacy engines. The PW1100G-JM engine is offered on the Airbus A320neo family of aircraft. PW1000G GTF engine models also power the Airbus A220 passenger aircraft and Embraer's E-Jet E2 family of aircraft. In addition, P&WC's PW800 engine has been selected to exclusively power Gulfstream's G400, G500 and G600 business jets, as well as to power Dassault's Falcon 6X business jet, which is scheduled to enter into service in 2023.

> *     *     *

> The development of new engines and improvements to current production engines present important growth opportunities for Pratt & Whitney. In view of the risks and costs associated with developing new engines, Pratt & Whitney has entered into collaboration arrangements in which revenues, costs and risks are shared with

third parties. At December 31, 2022, the interests of third-party collaboration participants in Pratt & Whitney-directed jet engine programs ranged, in the aggregate per program, from 13% to 49%. See "Note 1: Basis of Presentation and Summary of Accounting Principles" within Item 8 of this Form 10-K for a description of our accounting for collaboration arrangements. Pratt & Whitney also continues to enhance its programs through performance improvement measures and product base expansion, utilizing similar collaboration arrangements.

*In 2022, Pratt & Whitney reached significant milestones on the GTF engine program, including surpassing a billion gallons of fuel saved and 10 million metric tons of carbon emissions avoided since entry into service. The GTF Advantage engine for the A320neo family began Federal Aviation Regulations Part 33 (FAR33) certification and development flight testing on the A320neo aircraft, and successfully ran on 100% sustainable aviation fuel (SAF). The GTF Advantage configuration extends the economic and environmental benefits of today's GTF engine, as it reduces fuel consumption by an additional 1 percent, extending the engine's lead as the most efficient powerplant for the A320neo family. The GTF family now powers more than 1,400 aircraft across 64 airlines and three aircraft platforms: Airbus A320neo family, Airbus A220 and Embraer E-Jets E2.* The year also saw the entry into service of multiple new platforms, including the Cessna SkyCourier, Daher Kodiak 900 and TBM960, and ATR's next generation 42 & 72 aircraft powered by the new PW127XT-M engines, with Transport Canada engine certifications of the PW127XT-M, PW812GA and PW812D engines to power the ATR 72-600 regional turboprop, Gulfstream G400 and Dassault Falcon 6X aircraft respectively.. . .

(Emphasis added).

30.    These statements were materially false and misleading because there were quality control issues that had affected the GTF engines, and which would later require their recall from service, affecting various customers.

31.    The statements contained in ¶¶ 18, 19, 21, 23, 24, 26, 28, and 29 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the GTF engines had been affected from at least 2015-2020 by quality control issues; (2) these quality control issues would require RTX to recall and reinspect many of its GTF airplanes, affecting customers and harming its business; and

as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH BEGINS TO EMERGE

32.    On July 25, 2023, *Reuters* released an article entitled "RTX shares tumble on Pratt & Whitney airliner engine problem."  The article discussed how RTX stock had dropped on the news of issues with Pratt & Whitney engines.  In pertinent part, it said that RTX's stock price had fallen "10% . . . as it said more than 1,000 engines must [be] removed from Airbus planes and checked for microscopic cracks."  This was due to a "'rare condition' in powdered metal [which] meant 1,200 of more than 3,000 engines . . . have to be taken off and inspected for micro cracks that would point to fatigue."  The article noted that "[q]uestions remained over the cash impact," to the Company.

33.    On this news, RTX's share price fell $9.91 per share, or 10.2%, to close at $87.10 on July 25, 2023.

34.    Despite these revelations, RTX continued to issue false and misleading statements, obscuring the extent of the Company's liability.  For example, on RTX's earnings call for the second quarter of 2023, held on July 25, 2023 (the "Q2 2023 Earnings Call"), the Company stated that its quality control issues would force RTX to inspect 1,200 potentially affected engines and reduce the Company's cash flow for 2023 by $500 million.

35.    The statement contained in ¶ 34 was materially false and/or misleading because it misrepresented and/or failed to disclose the extent of the liability RTX was facing from the problems with the GTF engines.

## THE TRUTH CONTINUES TO EMERGE

36.    On September 11, 2023, RTX issued a press release which more fully revealed the liability it faced due to the GTF engine issues.  This Company disclosure put investors on notice

that the scope of RTX's liability was much larger than what had been communicated in July 2023. A series of news articles that were published on the same day reported the previously undisclosed financial impact from the GTF engine issues. For example, *The Wall Street Journal* released an article entitled "RTX Engine Recall to Cut Profit by Up to $3.5 Billion." This article explained that it would "cost [RTX] up to $7 billion to repair Pratt & Whitney engines and compensate airlines for fixes that will ground more than 600 Airbus jets for inspections in 2024," and that RTX's "profit will take up to a $3.5 billion hit from the recall of hundreds of engines over the next several years," significantly larger losses than the initial estimation announced by Defendants. Likewise, an article in the *Financial Times* entitled "RTX hit with $3bn charge from Pratt & Whitney aero engine recall," from the same day also noted that the costs were "a greater hit than [RTX] initially signalled in July."

37.    *Bloomberg* also released an article entitled "Pratt Engine Flaw to Idle Hundreds of A320 Planes for Years," which reported that "[RTX] dramatically expanded the scope of required engine checks at its Pratt & Whitney unit." Pursuant to these expansions, 3,000 GTF engines would be inspected (as opposed to the previously reported 1,200) and RTX would "replace as many high-pressure turbine disks as possible with new parts that have a full service life," another expansion to the plan outlined in July.

38.    On this news, RTX's share price fell $6.58 per share, or 7.9%, to close at $76.90 on September 11, 2023.

39.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and the other Class members have suffered significant losses and damages.

## ADDITIONAL SCIENTER ALLEGATIONS

40.    During the Class Period, as alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

41.    The Individual Defendants permitted RTX to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's securities.

42.    As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding RTX, their control over, receipt, and/or modification of RTX's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning RTX, participated in the fraudulent scheme alleged herein.

43.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of RTX securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding RTX's business, operations, and management and the intrinsic value of RTX securities and caused Plaintiff and members of the Class to purchase RTX securities at artificially inflated prices.

13

## LOSS CAUSATION/ECONOMIC LOSS

44.    During the Class Period, as detailed herein, RTX and the Individual Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of RTX securities, and operated as a fraud or deceit on Class Period purchasers of RTX securities by misrepresenting the value and prospects for the Company's business, growth prospects, and accounting compliance.  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of RTX securities fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of RTX securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

45.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of RTX who knew that the statement was false when made.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

46.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired RTX securities publicly traded on the NYSE during the Class Period, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

47.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, the Company's securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

48.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

49.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

50.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

51.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

52.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- the Company's securities met the requirements for listing, and were listed and actively traded on the NYSE, an efficient market;

- as a public issuer, the Company filed public reports;

- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

53. Based on the foregoing, the market for the Company securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the common units, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

54. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## <u>COUNT I</u>
### <u>For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder</u>
### <u>Against All Defendants</u>

55. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

56.    This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

57.    During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

58.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

59.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.  These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential

proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

60.     Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company's personnel to members of the investing public, including Plaintiff and the Class.

61.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period.  In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

62.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

63.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

64.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of

the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

65.    Plaintiff repeats and re-alleges the allegations contained in ¶¶ 1-54 as if fully set forth herein.

66.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of revenue and profit and false financial statements.

67.    As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

68.    Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

69.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of itself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)     awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 28, 2023

Respectfully submitted,

/s/ Ian W. Sloss
Ian W. Sloss (ct31244)
Johnathan Seredynski (ct30412)
**SILVER GOLUB & TEITELL LLP**
One Landmark Square, Floor 15
Stamford, CT 06901
Telephone: (203) 425-4491
isloss@sgtlaw.com
jseredynski@sgtlaw.com

*Additional Counsel for Plaintiff*

Eric J. Belfi
Francis P. McConville
**Labaton Sucharow LLP**
140 Broadway
New York, New York 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
ebelfi@labaton.com
fmcconville@labaton.com

*Counsel for Plaintiff*

## CERTIFICATION

I, Daniel J. Greene, as Chief Administrative Officer of New England Teamsters Pension Fund ("New England Teamsters"), hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of New England Teamsters. I have reviewed a prepared complaint against RTX Corporation f/k/a Raytheon Technologies Corporation ("RTX") alleging violations of the federal securities laws, and authorize the filing of this pleading;

2.      New England Teamsters did not purchase RTX securities at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      New England Teamsters is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary. New England Teamsters fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act, including the selection and retention of counsel and overseeing the prosecution of the action for the Class;

4.      New England Teamsters' transactions in RTX securities during the Class Period are reflected in Exhibit A, attached hereto;

5.      New England Teamsters sought to serve as a lead plaintiff in the following class action filed under the federal securities laws during the last three years:

*Erie County Employees' Retirement System v. Cutera, Inc.*, No. 23-cv-02560 (N.D. Cal.)

6.      Beyond its pro rata share of any recovery, New England Teamsters will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 21ˢᵗ day of September, 2023.

Daniel J. Greene
Chief Administrative Officer
New England Teamsters Pension Fund

2

**EXHIBIT A**

**TRANSACTIONS IN RTX CORPORATION**

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 04/28/23 | 19,007 | $99.90 | ($1,898,799.30) |
| Purchase | 05/22/23 | 200 | $95.66 | ($19,132.00) |
| Sale | 05/26/23 | (800) | $93.26 | $74,608.00 |
| Sale | 06/23/23 | (100) | $96.91 | $9,691.00 |
| Sale | 06/28/23 | (600) | $95.87 | $57,522.00 |
| Sale | 07/28/23 | (2,400) | $87.34 | $209,616.00 |